# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| **United States of America,** | ) | No. 3-06-mj-00134-JDR |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Affidavit of** |
| | ) | **Elizabeth L Sabino** |
| **Betsy Lim & Michael Quan,** | ) | |
| | ) | |
| **Defendants** | ) | |
| | ) | |

I, Elizabeth L. Sabino, am an Officer with the United States Department of Homeland Security, Customs and Border Protection (CBP), and I am currently employed in the Anchorage Office at the Ted Stevens Anchorage International Airport. I have been assigned as the case officer in the matter of Betsy Lim, and in that capacity declare as follows:

1. I have been employed as an Immigration Inspector and Customs Border Protection Officer for the past 23 years. My current duties include conducting investigations into criminal violations of the Immigration and Nationality Act and other related statutes. I have been involved in the inspections of many citizens of the People's Republic of China who have arrived at the Ted Stevens Anchorage International Airport without travel documents or with fraudulent travel documents. I have received Basic Immigration Officer Training and Journeyman Immigration Officer Training.

2. Any facts or circumstances that are cited in this affidavit are familiar to me through my direct participation in this investigation and as related to me by other law enforcement officers pertaining to this investigation.

3. This affidavit is made in support of a criminal complaint charging Betsy Lim and Michael Quan with:

> Violation of Title 8, United States Code, Section 1324(a)(2), which makes it unlawful for anyone to knowingly or in reckless disregard of the fact that an alien who had not received prior official authorization to come to, enter or reside in the United States, brings to or attempts to bring to the United States, such alien, for the purpose of commercial advantage or private financial gain.

4.      On July 02, 2006 a passenger (later identified as CHY) arriving on China Air Flight #12 inbound from Taipei, Taiwan, with a final destination of New York City, presented a Singapore passport #S_ _ _ _215B in the name of L.Y.L., with a date of birth of August __, 19__. When the passenger had her fingerprints scanned into the US Visit computer system, a mismatch signal alerted the CBP officer.  US Visit is a security measure that captures fingerprints and photos of certain international visitors arriving at US Ports of Entry. CBP policy dictates that whenever a mismatch occurs, the individual is directed to a secondary inspection area for a closer examination.  The passport was examined by 2 supervisory officers and it was determined to be genuine.

5.      A more intensive comparison was made of the passport photo and the individual claiming to be L.Y.L.  The passport photo showed a mole on the face of L., however when officers examined the passenger's face it was discovered that a black marker had been used to simulate the mole.  A determination was made that the passport presented by C. (in the name of L.) had not been issued to her and she was an impostor to said document.

6.      China Airline officials were made aware of the results of the examination and informed that C. would not be continuing on the New York leg of the flight. The passenger representative then informed CBP officers that C. had been part of a group whose final destination was New York City.  A CBP officer went to the boarding gate and located the other 6 members of the group. Their alleged identities were as follows:

| Name | Date of birth | Passport |
|---|---|---|
| L. ,B | __/__/__ | S_ _ _ _510Z Singapore |
| Q. ,M | __/__/__ | A_ _ _ _ 0431 Malaysia |
| Q., D | __/__/__ | T_ _ _ _ 276D Singapore |
| C., G | __/__/__ | _ _ _ _ 72522  U.S. |
| H., C. L | __/__/19__ | S_ _ _ _499G  Singapore |
| Z., H. | __/__/19__ | S_ _ _ _ 444I   Singapore |

7.      The entire group was brought to the secondary inspection area and officers began to interview the individuals.  Examination of the photos in the passports presented by H. and Z. revealed they were also impostors to their passports.

8.      Betsy LIM was given her *Miranda* Warning at 1100 on July 02, 2006, by CBPO Jeff Pawlak and consented to a sworn statement without an attorney being present.  In it she claimed that she was bringing the 3 Singaporeans to the U.S. as a favor to a friend by the name of L., W. to whom she owed money. LIM admitted to bringing seven other aliens into the United States in the same manner with them pretending to be a family.  She claimed she did not know they were impostors to valid passports.  LIM said that $1000.00 was deducted from her debt to L. each time she escorted an individual to the U.S.

9.  Michael QUAN is the husband of Betsy LIM and D.Q. is their son. G. C. is LIM's son by her first husband. Michael QUAN consented to a sworn statement without an attorney after he was advised of his *Miranda* rights. The *Miranda* Warning was given at 1105 on July 02, 2006, by SCBPO Michael P. Mitchell. In the statement, QUAN claimed that he was introduced to the three Singaporeans by his wife who told him they were her cousins. He was unable to speak to them because he does not speak Mandarin Chinese. He said that his wife and the two children were going on vacation but he did not know the plans of the other three persons.

10. C., the individual who had mismatched during the primary inspection, at first insisted she was from Singapore but later recanted and admitted to being a citizen of the People's Republic of China and gave her date of birth as August __, 19__. In a sworn statement, C. stated that she had obtained the Singapore passport (S_ _ _ _215B) from Betsy LIM when she met her at a hotel in Fuzhou, China. The payment for said document was $73,000.00 with the money to be paid from salaries gained in employment in the U.S. In addition, CHEN claimed that LIM had coached her on what to say when questioned by U.S. government officials upon arrival at the airport. C. made a claim of political asylum during her statement.

11. The individual first identified as Z., H., kept insisting she was from Singapore and that the passport (S_ _ _ _444I) was rightfully hers. However, later on she admitted that her true name was L., Y. J. and she was in fact a citizen of the People's Republic of China. She stated that the passport was obtained from Betsy LIM and the cost of the document was $73,000.00. She intended to seek employment in the U.S. so she could pay off the debt owed to LIM. LIM and her husband, QUAN, advised LIN to be calm and not appear nervous during the immigration process at the U.S. port of entry. LIN requested a hearing before an Immigration Judge in order to file a claim of political asylum.

12. The individual first identified as H., C. L. continued with his claim of being a citizen of Singapore. He knew nothing about Singapore and could not provide a home address of his parents. At one point he asked to be returned to Singapore saying he had a return ticket. He repeatedly stated, "my name is H., C. L. and I am from Singapore". When it was disclosed to H. that his two traveling companions had confessed to being citizens of China, he made a true sworn statement and admitted his name was Z., R. W. born on August __, 19__, in the People's Republic of China. The passport he presented to CBP officers (S_ _ _ _499G) was in fact provided to him by Betsy LIM who he referred to as "the lady". LIM told him he would have to pay $73,000.00 once he arrived in the U.S. and secured employment. LIM also secured the Malaysian visa for Z. and his 2 companions (L. and C.) to travel to Kuala Lumpur, Malaysia. LIM met them on their arrival and took them to a local hotel where they stayed for 2 days. LIM told him that upon questioning by U.S. government officials at the airport he was to insist the Singaporean passport was his and he was only coming on vacation. At the end of the sworn statement Z. stated he wanted a hearing before an Immigration Judge in order to file a claim of political asylum.

13.     LIM later told CBP officers that she wished to tell the truth in the whole matter. She wrote a statement where she expressed guilt and shame for her role in the smuggling of the 3 Chinese aliens. She admitted that she and her husband (QUAN) were "just transporters for these Chinese nationals." According to LIM, "my job is to treat them right take good care of them & bring them into the U.S.A." LIM admitted payment for this "job" was $5000.00 per person. In the statement she tried to take some of the blame away from her husband, claiming she was the only one who communicated with the smuggling organization since QUAN could not speak Mandarin Chinese.

14.     A review of the entry data on the passport used by CHEN, the individual who mismatched in US Visit on July 02, 2006, showed a passport with the same biographical information being presented on December 25, 2005, by an individual arriving at Anchorage, Alaska, on China Air Flight #12. Betsy LIM also arrived on that same flight on said date. Times and dates are assigned to each inspection conducted. LIM's time was 12:39 and her husband's 12:43. Between those times three women including CHEN were inspected. The three women accompanying LIM on December 25, 2005, were H. M.C., P.C. and Y.L.L.. They each presented a Singapore passport to CBP officers upon entry. When the photo for H. M. C. was captured by the US Visit system, Betsy LIM could be seen standing next to CHEN. The passport presented by C., H. Y. on July 02, 2006, contained a note written by the Singaporean passport agency. It stated that the previous passport issued to Y. L. L. was reported to have been lost. The Singapore passport agency reissues the same passport number when the document is reported lost. A check in the TECS (Treasury Enforcement Communication System) did not reveal any departure information from the U.S. for these three women.

15.     On July 6, 2006, a second interview was conducted with Betsy LIM and again she waived her rights in having an attorney present during the interview. When asked about her husband's participation in the smuggling operation, she replied "my husband and I carry the same role. Basically, we are transporters." She explained that before a trip is made to the U.S., QUAN picks up the tickets for his family and the persons accompanying them. When they arrive at the airport in Malaysia he meets them and provides transportation to the hotel. He also takes them shopping and out to dinner.

16.     On July 6, 2006, a second interview was conducted with Michael QUAN and again he waived his rights in having an attorney present during the interview. QUAN began by saying he became aware of the smuggling operation only one month ago. However, CBP's research had shown his travel with LIM into the U.S. began on August 26, 2005. QUAN labeled LIM's role in the operation as being a "transporter." She told him that the PRC aliens had relatives in the U.S. and they were all decent people who just wanted to work and find a better life in the U.S. He was unsure of the people in the smuggling organization she was dealing with. QUAN said he was worried about what kind of people they were.

17.     QUAN admitted to being paid by LIM $3000-$5000 per trip once they returned to Malaysia. The money was paid in Malaysian ringgit. QUAN claimed he filed bankruptcy in 2001 due to financial losses in the real estate market. He said he was "cash

strapped" and he continued to take the money from LIM even though he was aware of the illegality of his part in the scheme. He believes LIM is receiving a larger share of the money. When he questioned her about particular aspects of the operation she told him the less he knew the better it would be for him.

18.     QUAN was asked if he had ever seen any passports, other than the family's, at the residence he shared with LIM. QUAN admitted he noticed different Singaporean passports at various times when LIM returned from trips to Singapore. On a trip to Bangkok, Thailand, with LIM and their son, D., he was introduced to three people and was told by LIM that they would be their traveling companions on an upcoming trip to the U.S. He also met an individual by the name of LIN who he identified as a member of the smuggling organization.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

19.     Based on all of the above, I believe that on July 2, 2006, Betsy LIM and Michael QUAN, knowingly or in reckless disregard of the fact that three Chinese aliens who had not received prior official authorization to come to, enter or reside, in the United States, brought into the United States three Chinese aliens for the purpose of commercial advantage or private financial gain.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

/s/ Elizabeth L. Sabino
Elizabeth L. Sabino
Customs and Border Protection Officer

SUBSCRIBED AND SWORN TO before me this 7th day of July 2006, at Anchorage, Alaska.

/s/ John D. Roberts [seal affixed]
United States Magistrate Judge